## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PAVEL RUIZ, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**I.     INTRODUCTION**

1. From at least June 2020 until August 2021, Defendant Pavel Ruiz ("Ruiz") personally, and through his team of sales agents, raised at least $46 million from over 5,100 investors on behalf of MJ Capital Funding, LLC ("MJ Capital") and its affiliate MJ Taxes and More, Inc. ("MJ Taxes") (collectively, the "MJ Companies").

2. The MJ Companies and their owner, chief executive offer, and president, Johanna M. Garcia ("Garcia"), operated the MJ Companies as a Ponzi scheme, which, from at least June 2020 until August 2021, raised over $196 million from more than 15,400 investors nationwide through an unregistered fraudulent securities offering. Garcia and the MJ Companies tricked investors into thinking their investment would be used to fund small business loans called Merchant Cash Advances ("MCAs") in exchange for a percentage of the business' income over a specified period of time. In reality, investors' outsize annualized "returns" of 120% – 180% were funded with money obtained from new investors.

3. The Ponzi scheme collapsed once the Commission filed its emergency action to stop this ongoing fraud on August 9, 2021, against Garcia and the MJ Companies (collectively, the "MJ Defendants"). *SEC v. MJ Capital Funding, LLC, et al.*, No.: 21-61644-CIV-AHS (S.D. Fla.). On August 11, 2021, the Court granted the Commission's motions for an asset freeze and injunctive relief against the MJ Defendants and the appointment of a receiver over the MJ Companies.

4. Ruiz played a significant role in perpetrating the Ponzi scheme. At all relevant times, he was involved in high-level decision-making for MJ Capital, served as an MJ Capital "board member" responsible for "Treasury/Accounting", and had access to MJ Capital's bank accounts.

5. Ruiz told investors that their money would be used to fund the MJ Companies' purported MCA business and, in exchange, they would receive returns of 10% to 15% per month along with the return of their principal investment upon maturity.

6. But only a small fraction of investor funds was used to make MCAs. Instead, most of the investor funds were used to pay fictitious returns to existing investors, undisclosed commissions to sales agents who promoted investments in the MJ Companies, and personal expenses for insiders of the MJ Companies, including Ruiz. As such, investors' ability to receive the promised returns and repayment of principal was dependent on a rising stream of funds from new investors, and by convincing existing investors to renew their existing investments, thus deferring the MJ Companies' need to repay investors their principal investment.

7. Furthermore, at all relevant times, Pavel held no securities licenses, was not registered with the Commission, and was not associated with a registered broker-dealer. The MJ

Companies' securities were not registered with the Commission, nor did they qualify for an exemption from registration. Ruiz thus was not permitted to sell the MJ Companies' securities.

8. By engaging in this conduct, Ruiz violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## II. DEFENDANT

9. Ruiz is a resident of Ft. Lauderdale, Florida. Ruiz was a lead sales agent and "board member" of MJ Capital. He also is the owner and managing member of Pavel Ruiz MJCF LLC ("Ruiz LLC") and UDM Remodeling LLC ("UDM"). On October 14, 2021, upon motion of the Receiver, the Court expanded the receivership to include Ruiz LLC and UDM.

## III. OTHER RELEVANT ENTITIES AND INDIVIDUAL

10. MJ Capital is a Florida limited liability company located in Pompano Beach, Florida. Garcia formed MJ Capital in June 2020 and is its Manager, an Authorized Member, and President. MJ Capital purports to be in the business of providing merchant cash advances to businesses located in Florida and throughout the United States. MJ Capital claimed to fund millions of dollars in merchant capital loans to small business owners in exchange for a percentage of the business' income over a specified period of time, with the amount of such funding having steadily increased every month since its inception in 2020. The total amount to be repaid is supposedly calculated by a factor rate, a multiplier generally based on a business' financial status. The Court appointed the Receiver over MJ Capital on August 11, 2021, and entered a Judgment for Permanent Injunctive Relief against MJ Capital on October 1, 2021.

11. MJ Taxes is a Florida corporation located in the same office as MJ Capital in Pompano Beach. Garcia incorporated MJ Taxes in December 2016 as MJ Tax Services & More Inc. and is its President. In March 2020, Garcia changed the company's name to MJ Taxes and More Inc. The Court appointed the Receiver over MJ Taxes on August 11, 2021, and entered a Judgment for Permanent Injunctive Relief against MJ Taxes on October 1, 2021.

12. Garcia is a resident of North Lauderdale, Florida. Garcia controlled the MJ Companies prior to their going into receivership. On September 8, 2021, the Court, by consent, entered a preliminary injunction against Garcia.

## IV.    JURISDICTION AND VENUE

13. The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

14. This Court has personal jurisdiction over Ruiz, and venue is proper in the Southern District of Florida, because many of Ruiz's acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida, where Ruiz resides and conducts business.

15. In connection with the conduct alleged in this Complaint, Ruiz, directly and indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## V.    FACTS

### A.    The MJ Defendants' Securities and Solicitation of Investor Funds

16. Since at least June 2020, MJ Taxes began soliciting investments, agreeing to pay annual returns of varying amounts, typically 120%, for six-month investments. Between June 2020

and September 2020, MJ Taxes and investors entered into written agreements, signed by Garcia on behalf of MJ Taxes, called a Loan Agreement. These agreements refer to the investor as "Investor" or "Lender" and MJ Taxes as the "Facilitator" or "Borrower."

17. Beginning at least as early as October 2020, MJ Capital became the primary investment vehicle for raising funds from investors. From October 2020 until the Ponzi scheme collapsed in August 2021, MJ Capital entered into written agreements with investors called a Merchant Cash Advance Agreement. These agreements refer to the investor as the "Purchaser," and MJ Capital agrees that it will use the investor's money to fund an MCA. MJ Capital promises an annual return of varying amounts, typically 120%, with MJ Capital guaranteeing repayment of principal if the merchant defaults. The term of the investment is either six months, 9 months, 12 months or six months with an option by the investor to extend the term for an additional six months.

18. In addition to the written agreement, MJ Capital required investors to sign: a Non-Disclosure Agreement, where the investor would agree not to disclose confidential information about MJ Capital; a Purchaser Non-Compete Agreement, where the investor would agree not to engage in any business that would compete with MJ Capital for two years; an IRS W-9 form; and a Referral Program Agreement, which allowed an investor to receive a one-time referral bonus of an unspecified amount for each referred person who invests with MJ Capital.

19. The MJ Companies solicited investors through its own employees, external sales agents, and word-of-mouth.

20. MJ Capital employed a multi-tiered sales team to solicit investors and a complex payment system to pay these agents. The sales team hierarchy was as follows: Board Member, Manager, Team Leader, and Account Representative. Multiple undisclosed commission payments,

which came out of the offering proceeds, were paid to each agent in this hierarchy based on each investment.

21.     MJ Capital also solicited investors through its website and social media. MJ Capital's then website, www.mjcapitalfunds.com (the "Website"), whose domain name was registered on July 29, 2020, represented that MJ Capital was in the business of funding MCAs and that investor money would be used for this purpose. The Website provided background information on how MJ Capital can assist small businesses with merchant cash advances and further invited business owners to fill out an online application for funding. For example, the Website stated that MJ Capital could provide "an alternative option to satisfy a business's financial needs", and that it had a "pipeline of investors" from whom the business could expect "cash of up to $200,000 to fulfill [its] needs . . . ."

22.     At least as early as May 12, 2021, the Website's "blog" section stated: "[MJ Capital] has grown to an extent where there is a team of underwriters who qualify every company that seeks funds from MJ Capital. There are no exceptions to this! The process consists of checking 6 months' worth of bank statements, last year's tax returns, and [the merchant's] profit and loss sheet for the last year."

23.     Additionally, at least as early as May 12, 2021, MJ Capital represented through social media that it is in the business of funding MCAs and offers "quick approvals," "fast funding," "flexible terms" and "help[s] small businesses". Its then Twitter page touted: "MJ Capital specializes in MCA funding for businesses, our goal is to help you and your business thrive during uncertain times by working with our team."

24.     In or around June 2021, an undercover Federal Bureau of Investigation agent ("UC") posing as a prospective investor spoke with MJ Capital's officer manager at MJ Capital's

6

office in Pompano Beach. The office manager explained, among other things, that MJ Capital would use the UC's funds to purchase future sales or profits of companies and the UC would make a 10% monthly return, an underwriting team determines a merchant's ability to repay, and MJ Capital has liens on a merchant's projects as further security.

25. The Loan Agreements and Merchant Cash Advance Agreements (the "Agreements") are investment contracts. Investors looked solely to the MJ Companies to produce returns, and the MJ Companies' ability to do so depended entirely on their ability to either fund profitable MCAs or attract new investors to cover payments to existing investors. The Agreements are also notes. As investment contracts and/or notes, the Agreements are securities within the meaning of the Securities Act and the Exchange Act. These securities have not been registered with the Commission.

**B.    The MJ Defendants' Material Misrepresentations to Investors and Misuse and Misappropriation of Investor Funds**

26. The representations that the MJ Companies were using investor money to fund MCAs and that their money was secure were lies. In fact, the MJ Companies made very few MCAs, they did not file liens in connection with the few MCAs they did make, and investors' ability to receive the promised returns and repayment of principal was dependent on the MJ Defendants' ability to continue to raise new investor money and convince existing investors to extend the term of their agreements.

27. From June 1, 2020 through August 31, 2021, the MJ Companies received at least $196 million in investor funds from investors in Florida and several other states. However, the MJ Companies only made approximately $895,000 in MCAs. During that same time period, the MJ Companies received approximately $393,000 in repayment for those MCAs.

28. From June 1, 2020 through August 31, 2021, the MJ Companies misused investor funds by making payments totaling at least $61.8 million to sales agents for promoting investments in the MJ Companies. The MJ Companies also misused investor funds by making payments on loans owed by MJ Taxes via transfers to MJ Taxes' bank account.

29. From June 1, 2020 through August 31, 2021, Garcia and the MJ Companies also misappropriated at least $7.4 million of investor funds on a variety of purchases unrelated to the business, including credit card payments, travel, entertainment, restaurants, and luxury goods and clothing.

30. Because the MJ Companies made few MCAs and were diverting substantial investor money, the MJ Companies were not earning anywhere near the revenue needed to pay the promised returns to investors.

31. From June 1, 2020 through August 31, 2021, the MJ Companies paid at least $109 million in purported returns to investors. However, instead of paying investors out of the revenue of the business, the MJ Companies used new investor money to pay returns to existing investors.

32. The investments in the MJ Companies were not secure. To the contrary, the only way the MJ Companies could honor their obligations to investors would be by successful continuation of their fraudulent scheme. Once the supply of new investors was exhausted, the MJ Companies would be unable to pay the promised returns to existing investors.

**C. Ruiz's Material Misrepresentations to Investors, Misuse and Misappropriation of Investor Funds, and Offer and Sale of Securities in Unregistered Transactions**

33. Ruiz played a significant role in the MJ Companies' Ponzi scheme.

34. From at least June 2020 until August 2021, Ruiz personally, and through his team of about 70 sales agents, solicited and raised at least $46 million from over 5,100 investors on behalf of the MJ Companies.

35. Ruiz and his agents utilized MJ Capital's social media, such as Twitter and Instagram, and Zoom meetings to solicit investors. Ruiz trained and instructed his sales team on what to tell investors, including the sales pitch that they gave to potential investors. Ruiz and his team represented to investors and prospective investors that their funds would be used to make MCAs, and that they would receive returns of 10% to 15% per month and the return of their principal upon maturity.

36. Ruiz sometimes instructed his team to give investors Cash App, Zelle, and Venmo payment instructions, which were linked either to Ruiz's personal bank accounts or to the bank accounts of his two entities, Ruiz LLC and UDM. Other times, Ruiz and his team instructed investors to send money directly to MJ Capital. In other instances, investors made their investment in cash.

37. After investing through Ruiz and his team, investors would receive a signed MCA Agreement from the MJ Companies, which was signed by either Ruiz or someone on his team as authorized representatives of the MJ Companies.

38. During the relevant time period, Ruiz received at least $292,000, and his team received at least $5.3 million, in commission payments directly from MJ Capital.

39. In addition to the $292,000 in commission payments he received, Ruiz misappropriated millions of dollars from investors. Of the $46 million Ruiz and his team raised from the MJ Companies' investors, Ruiz deposited approximately $7.7 million directly into his

personal accounts or that of his two entities, Ruiz LLC and UDM.  Ruiz only transferred about $1.2 million of these investor funds to MJ Capital.

40. Ruiz misappropriated or misused the rest of this money, approximately $6.5 million. Among other things, Ruiz spent the money on personal expenses such as to purchase crypto assets and a luxury vehicle, payments to his sales team and staff even though they were already receiving commission payments directly from MJ Capital's bank accounts, and to make Ponzi-like payments to some investors even though the majority of investors brought in by his team received their purported interest payments directly from MJ Capital.

41. Ruiz's representations that the MJ Companies would use investor money to fund MCAs was false. Investor funds were rarely used to fund MCAs. Instead, Ruiz and the MJ Defendants misused and misappropriated investor funds.

42. Ruiz had online access to MJ Capital's bank accounts. He also controlled his personal and business bank accounts, including Ruiz LLC and UDM.

43. Ruiz had ultimate authority for the false and misleading statements he and his sales team made to investors and prospective investors, and in the documents, such as the Agreements, he and sales team provided to investors and prospective investors.

## VI.    CLAIMS FOR RELIEF

### COUNT 1

### Violations of Sections 5(a) and (c) of the Securities Act

44. The Commission adopts by reference paragraphs 1 through 43 of this Complaint

45. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions issued by the MJ Companies

described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

46. From at least as early as June 2020 through August 2021, Defendant directly and indirectly:

> (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;
>
> (b) carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or
>
> (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

47. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT 2

### Violations of Section 17(a)(1) of the Securities Act

48. The Commission adopts by reference paragraphs 1 through 43 of this Complaint.

49. From at least as early as June 2020 through August 2021, Defendant, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud.

50. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT 3

### Violations of Section 17(a)(2) of the Securities Act

51. The Commission adopts by reference paragraphs 1 through 43 of this Complaint.

52. From at least as early as June 2020 through August 2021, Defendant, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

53. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT 4

### Violations of Section 17(a)(3) of the Securities Act

54. The Commission adopts by reference paragraphs 1 through 43 of this Complaint.

55. From at least as early as June 2020 through August 2021, Defendant, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

56. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT 5

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

57. The Commission adopts by reference paragraphs 1 through 43 of this Complaint.

58. From at least as early as June 2020 through August 2021, Defendant, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

59. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 6

### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

60. The Commission adopts by reference paragraphs 1 through 43 of this Complaint.

61. From at least as early as June 2020 through August 2021, Defendant, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

62. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 7

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act

63. The Commission adopts by reference paragraphs 1 through 43 of this Complaint.

64. From at least as early as June 2020 through August 2021, Defendant, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

65. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 8

### Violations of Section 15(a)(1) of the Exchange Act

66. The Commission adopts by reference paragraphs 1 through 43 of this Complaint.

67. From at least as early as June 2020 through August 2021, Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or not associated with an entity registered with the Commission as a broker-dealer.

68. By reason of the foregoing, Defendant, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## VII. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find that Defendant committed the violations of the federal securities laws alleged herein and:

### A. Permanent Injunctive Relief

Issue a Permanent Injunction enjoining Defendant from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 15(a)(1) of the Exchange Act.

### B. Disgorgement

Issue an Order directing Defendant to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### C. Civil Penalty

Issue an Order directing Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d).

## **DEMAND FOR JURY TRIAL**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

August 29, 2022								Respectfully submitted,

					By:	*/s/ Stephanie N. Moot*
						Stephanie N. Moot
						Senior Trial Counsel
						Fla. Bar No. 30377
						Direct Dial: (305) 982-6313
						Email: moots@sec.gov

						Raynette R. Nicoleau
						Fla. Bar No. 278210
						Senior Counsel
						Direct Dial: (305) 982-6308
						Fax: (305) 536-4154

						Attorneys for Plaintiff
						**SECURITIES AND EXCHANGE COMMISSION**
						801 Brickell Avenue, Suite 1950
						Miami, Florida 33131
						Telephone: (305) 982-6300
						Facsimile: (305) 536-4146